# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00347-CV

---

**T. W., Appellant**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE COUNTY COURT AT LAW NO. 1 OF WILLIAMSON COUNTY
NO. 17-0049-CPSC1, HONORABLE SUZANNE BROOKS, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellant T.W. appeals the trial court's final order after a bench trial terminating his parental rights to his child, S.E.W.[1]  The court found that Appellant: (1) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endangered the physical or emotional well-being of the child; (2) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of the child; and (4) used a controlled substance in a manner that endangered the health or safety of the child, and failed to complete a court-ordered substance abuse treatment program, or continued to abuse a controlled substance after completion of a court-ordered substance abuse treatment program. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O),

---

[1] We refer to the parties by their roles in this appeal.  *See* Tex. R. App. P. 9.8(b).

(P). The court further found that termination of Appellant's parental rights was in the child's best interest. *See id.* § 161.001(2).

On appeal, Appellant challenges the factual sufficiency of the evidence supporting the trial court's best-interest finding and the court's admission into evidence of: (1) a complaint and arrest warrant alleging that Appellant assaulted his girlfriend Kenyatta Johnson; (2) a complaint and arrest warrant alleging Appellant's attempted robbery of Stanley Harvey; and (3) Appellant's indictment for the robbery of Stanley Harvey.[2]  We will affirm the court's order of termination.

## BACKGROUND[3]

In evaluating Appellant's factual sufficiency challenge, we review the entire record. Several witnesses testified at the bench trial below, including Appellant, a Department caseworker, a Department investigator, a police detective, S.E.W.'s maternal grandfather, and a Court Appointed Special Advocate (CASA).  During trial, the court heard that Appellant is the biological father of S.E.W., who was seven years old at the time of trial.  S.E.W.'s mother, S.F., died on November 28, 2016, before the Department's suit was filed.

S.E.W.'s Grandfather testified that S.E.W.'s parents split up when she was around two years old, and that after the separation, S.E.W. stayed with Mother on the weekends and with Grandfather during the week.  Mother had sickle-cell disease, and when her illness flared up,

---

[2]  Appellant concedes the sufficiency of the evidence supporting the trial court's termination finding under subsection 161.001(O) of the Texas Family Code—i.e., that he failed to comply with the provisions of a court order specifically establishing the actions necessary for him to obtain the return of the child who had been in the Department's conservatorship for not less than nine months after her removal—and he does not challenge the remaining predicate grounds for termination.

[3]  The facts are summarized from the testimony and exhibits admitted into evidence at trial.

2

Grandfather and his sister, Great Aunt—with whom S.E.W. currently lives—would help care for S.E.W. and her younger brother. Grandfather testified that Appellant visited S.E.W. only "occasionally." Grandfather recalled that Appellant did not pay child support for S.E.W. to Mother or to him, and even after Mother was diagnosed with cancer, Appellant did not begin providing care or financial support for S.E.W.

After Mother's death, S.E.W. lived with Grandfather. He testified that S.E.W. never indicated to him that she wanted to see Appellant. Near Christmas Day in 2016, without discussing a change in S.E.W.'s living arrangements with Grandfather, Appellant picked up S.E.W. from her brother's grandmother's home. Grandfather was unable to have contact with S.E.W. again until Appellant went to jail. Grandfather denied receiving any benefits for S.E.W. when he cared for her after Mother's death, but he confirmed that the Department applied for those benefits and that Great Aunt now receives them. He testified that S.E.W. is doing "real well" in Great Aunt's home.

Detective Jeremiah Ellison of the Williamson County Sheriff's office testified that he arrested Appellant on March 30, 2017, for possession of a controlled substance and possession of marihuana. Detective Ellison stated that Appellant had 3.6 grams of crack cocaine inside a plastic container in his shoe, a marihuana joint in his pocket, and about $7,000 of U.S. currency bundled in rubber bands. Detective Ellison opined that having parents involved in the dealing and use of narcotics is "not a good situation at all" for children. Appellant's attorney indicated that these drug charges were still pending at the time of trial. When Appellant was asked if the cocaine in his shoe belonged to him, his attorney advised him to assert his Fifth Amendment privilege, and Appellant did so.

3

Department investigator Tanesha Chavies testified that in April 2017 she responded to a report that Appellant was in the vicinity of a drug raid, and that he was arrested after drugs were found in his vehicle. During the time of Chavies's investigation, S.E.W. lived in a duplex with Appellant, his Girlfriend, Girlfriend's grandmother, and Girlfriend's four children, although two of them were in and out of the home. S.E.W. had only lived in the home for a few months, since December 2016. When Chavies asked Appellant about the charges, he told her "they didn't have anything on him." Chavies stated that Appellant was asked to complete a drug test but he refused. Chavies also investigated Appellant's live-in Girlfriend as to allegations of drug use in the presence of the children and drugs being accessible to them. Girlfriend's children told Chavies that they witnessed domestic violence between Appellant and Girlfriend, with Appellant being the perpetrator. S.E.W. was not living with Girlfriend and Appellant at the time of that incident. Chavies confirmed that Appellant was convicted of domestic violence in 2016.

Chavies testified that she thought Appellant had no contact with S.E.W. before Mother's death. When Chavies interviewed S.E.W., who was then about age five, S.E.W. indicated an understanding of drugs by describing cocaine use. S.E.W. was enrolled in school, but had missed more days than she was present. Chavies confirmed that there was no indication Appellant and Girlfriend were homeschooling S.E.W. A truancy filing was initiated during the investigation, and Appellant withdrew S.E.W. from school, purportedly so that Girlfriend could homeschool her. Chavies was not provided any information about such homeschooling and did not know what S.E.W. routinely did during the day after she was withdrawn from school.

4

Department Caseworker Melissa Laschever testified about Appellant's criminal history, including his charges for assault-family violence in 2007, 2010, and 2016. At trial, Appellant testified that he had never been arrested for assaulting Girlfriend, and Girlfriend also denied any domestic violence between them. However, a certified copy of a complaint and arrest warrant, admitted into evidence at trial, reflected that Appellant was arrested for assaulting Girlfriend in March 2016. The complaint stated that Appellant tackled Girlfriend and placed both hands around her neck while applying pressure, which impeded her ability to breathe for 3–5 seconds.

A few months later in July 2016, Appellant was indicted for robbery. The robbery complaint reflected that Appellant grabbed the victim, his older cousin, by the throat from the backseat of a vehicle and choked him for about 15 seconds, at times impeding his ability to breathe. A certified copy of Appellant's judgment of conviction, admitted into evidence at trial, reflected that Appellant pleaded guilty to the lesser-included offense of assault on December 15, 2016, and was sentenced to serve 350 days in jail with credit for 175 days. Because that offense occurred on June 23, 2016, the trial court inferred that Appellant was incarcerated for most of S.E.W.'s fifth year, including the time of Mother's death.

Caseworker Laschever testified that she did not know where Appellant was currently living, or whether he and Girlfriend were living together. She stated that she created a service plan for Appellant, which required him to pay child support in the amount of $224 monthly beginning July 2017, participate in random drug testing, participate in a drug and alcohol evaluation through OSAR (Outreach, Screening, Assessment, and Referral Centers) and follow its recommendations, refrain from criminal activity, maintain a safe and appropriate home and allow the caseworker to

5

perform home visits, complete a protective parenting class, complete a psychological evaluation and follow all recommendations, attend counseling sessions with a provider approved by the Department, and engage in family counseling with Girlfriend if recommended by his therapist. The family service plan, dated June 14, 2017, was admitted into evidence. Caseworker Laschever testified that Appellant initially engaged in services, but stopped in August. She also testified that she referred Appellant for drug testing approximately ten times during the case, but he underwent only three oral-swab tests, which are limited to detecting drug use for the previous two days. She confirmed that Appellant did not submit to a hair-strand test, despite being ordered by the court to do so during his appearances at the last two hearings. She also confirmed that Appellant failed to pay the child support that was ordered during the case.

Caseworker Laschever testified about Appellant's lack of visitation with S.E.W. during the case. There was a stipulation that Appellant would arrive early to participate in an oral-swab drug test and then have visitation with S.E.W. But Appellant would sometimes fail to attend visits he had confirmed, or he would attend and refuse to submit to the drug test, which precluded the visit. Caseworker Laschever stated that this "was very hard on [S.E.W.] especially in the beginning of this case. It was very difficult for her to process the information. She really felt like she was being rejected." During a later hearing with Appellant, the Department stated that S.E.W. would not be transported for future visits until after Appellant appeared and complied with the drug test. After that change was made, Appellant did not appear for a visit.

The Department tried to re-engage Appellant in services after he discontinued his participation; however, some of the phone numbers he provided were not working numbers.

Caseworker Laschever stated that the Department also contacted Girlfriend in an effort to locate Appellant and re-engage him in the process, but those efforts were unsuccessful.

Caseworker Laschever stated that the visits Appellant did attend with S.E.W. were appropriate, and that S.E.W. might still want to see Appellant, but S.E.W. does not ask about him as much as she did earlier in the case. Caseworker Laschever testified that S.E.W.'s psychologist recommended play therapy, and that S.E.W. remain in her placement with Great Aunt so that S.E.W. could benefit from consistency of care and receive services to improve her "verbal expressive skills." Further, caseworker Laschever opined Appellant has not demonstrated that he can provide a safe and stable placement for S.E.W. and could be a threat to S.E.W.'s physical well-being if he is still using drugs and engaging in criminal activity. She stated that Appellant "denies everything" about his criminal and drug history, and that he did not indicate an understanding of the importance of S.E.W.'s school attendance, therapy, and having a consistent, stable household.

Ultimately, caseworker Laschever opined that it would be in S.E.W.'s best interest to be adopted by Great Aunt, with whom she has lived for about a year during the case and who is meeting all of S.E.W.'s physical and emotional needs. Caseworker Laschever testified that Great Aunt provides a very stable home environment, that S.E.W. has been attending school and therapy, that S.E.W. is receiving proper medical and dental care, and that S.E.W. is bonded to Great Aunt. Great Aunt also facilitates visitation with S.E.W.'s maternal family. Appellant would not provide information to facilitate S.E.W.'s visitation with her paternal family.

The court appointed special advocate (CASA), Nancy Kimbro, testified that she was concerned about Appellant's failure to complete his services, address the substance abuse and

7

domestic violence issues, and his lack of visitation with S.E.W. Kimbro stated that when Appellant was S.E.W.'s primary caregiver between December 2016 and April 2017, S.E.W. missed 21 days of school; Appellant did not attend any parent-teacher conferences or respond to the school's request for information on S.E.W.'s sickle-cell disease; and he withdrew her from school in April. Kimbro noted that S.E.W.'s medical records did not show that she had any illnesses during the time that she was missing school.

Kimbro testified that the visits Appellant did attend went well, and that S.E.W. seemed to enjoy them. However, Appellant became belligerent during one visit after refusing to submit to the oral-swab drug test. Kimbro stated that Appellant presented her with his own drug test, which was negative.

Kimbro opined that it would not be in S.E.W.'s best interest to maintain contact with Appellant under the current circumstances, noting that S.E.W. could be exposed to substance abuse continuing in the home or left alone to care for herself if Appellant had unsupervised contact with her. She further opined that future visitation with Appellant should be left to the discretion of Great Aunt, who would be protective of S.E.W. Kimbro further testified that Appellant did not have regular visits or contact with S.E.W. since she was one-and-a-half years old, including during the two-year period when Mother battled cancer, and Kimbro was concerned that Appellant's desire to have S.E.W. in his home stemmed from S.E.W.'s receipt of monetary benefits from the State.

According to Kimbro, Appellant's lack of visitation was a "major issue" for S.E.W. in therapy, causing her difficulty in knowing how to behave or feel in certain circumstances. Kimbro described the improvement she had seen in S.E.W. during the case, noting that she was initially very

8

quiet, timid, and withdrawn, and communicated in words instead of sentences. Since being with Great Aunt, S.E.W. is happy, energetic, loving, successful at school, and has friends in her neighborhood and at school.

Kimbro testified that Appellant did not facilitate contact between S.E.W. and her maternal family, including her half-brother and grandfather with whom she had lived periodically throughout her life. But now, S.E.W. considers Great Aunt's house her home and wants to stay there. Kimbro stated that S.E.W. seems very safe and secure with Great Aunt, and observed her rush from the bus after school to greet Great Aunt and give her a hug. S.E.W. has also bonded with her 14-year-old uncle who lives with Great Aunt, and they treat each other like siblings who fight but love each other. Kimbro noted that S.E.W. used to talk to her about Appellant, but she has not mentioned him for several months. Kimbro recommended termination of Appellant's parental rights, and stated her belief that it was in S.E.W.'s best interest to remain with Great Aunt.

The trial court also heard from Appellant, who stated that when Mother was still alive, he had visitation with S.E.W. every two weeks and sometimes for extended periods, until he went to jail in 2016. He stated that his problems with visitation began after he started a relationship with Girlfriend and child-support proceedings were initiated against him. Appellant indicated that he stopped attending therapy because he did not believe that he needed it, and that he chose not to engage in the service plan because he believed everything against him had been fabricated. He further testified that he did not visit S.E.W. at the Department because he felt like "a caged animal" being in a cubicle and evaluated instead of seeing her in another setting, like a park. Appellant

9

acknowledged that his lack of visitation must have affected S.E.W. "a lot," but he explained to her at the last hearing that he would be gone awhile because he was moving out of town for his job.

Appellant testified that his mother "had some issues with CPS" when he was growing up, and that he had been in CPS care as a child. Appellant testified that he did not want his parental rights terminated and that although he last saw S.E.W. at the end of 2017, he wanted her to be returned to his care or at least to have visitation with her. Appellant testified that he could take care of all her needs and wants, and claimed he had done so in the past. Girlfriend similarly testified that she believed Appellant would act in S.E.W.'s best interest, but she acknowledged that her own children are also in the Department's custody. Appellant testified that he works as a landscaper about forty hours a week. When the trial judge asked Appellant to state his address, Appellant initially responded with only a post office box in Taylor. He later testified that he was living with his mother and brother at a residence in Bartlett. Appellant stated that this home would be appropriate for S.E.W., but also stated that he was considering moving because of "the situation [he's] dealing with now," which he described as "continuous harassment" and "targeting." Appellant acknowledged that S.E.W.'s physical and emotional well-being would be endangered if her caregiver was engaged in substance abuse, criminal conduct, and violence.

At the conclusion of the trial, the court entered an order terminating Appellant's parental rights to S.E.W. This appeal followed.

## DISCUSSION

In a proceeding to terminate the parent-child relationship, the petitioner must establish by clear and convincing evidence a predicate violation—i.e., that the parent's acts or omissions

10

constitute a statutory ground for termination—and that termination of parental rights is in the child's best interest. Tex. Fam. Code § 161.001(b)(1), (2); *In re S.M.R.*, 434 S.W.3d 576, 580 (Tex. 2014). Appellant's first issue challenges the court's finding that termination was in the child's best interest, contending that it was not supported by factually sufficient evidence. *See* Tex. Fam. Code § 161.001(b)(2). We evaluate the factual sufficiency of the evidence by reviewing the entire record, and we uphold the finding unless the disputed evidence that could not reasonably have been credited in favor of the finding is so significant that a reasonable factfinder could not have formed a firm belief or conviction that the allegation was true. *In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014). We do not weigh witness credibility issues that depend on appearance and demeanor, and when credibility issues are reflected in the record, we must defer to the factfinder's determinations if they are not unreasonable. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005).

**Sufficient evidence supported best-interest finding**

In his first issue, Appellant challenges the factual sufficiency of the evidence supporting the trial court's best-interest determination. When deciding whether termination of parental rights was in the child's best interest, we may consider a non-exhaustive list of factors including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts

11

or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see* Tex. Fam. Code § 263.307 (noting that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest" and setting forth factors to consider in evaluating parent's willingness and ability to provide child with safe environment).[4] Proof of all these factors is not a prerequisite to termination of parental rights, and the absence of some factors does not preclude the court from finding by clear and convincing evidence that termination is in the child's best interest, especially when there is undisputed evidence that the parental relationship endangered the child. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Evidence that proves one or more of the statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *Id*. at 28.

---

[4] Several of the *Holley* factors overlap with the statutory factors set forth in section 263.307 of the Family Code, which include: the child's age and physical and mental vulnerabilities; the frequency and nature of out-of-home placements; the magnitude, frequency, and circumstances of the harm to the child; whether the child has been the victim of repeated harm after the initial report and intervention by the department; whether the child is fearful of living in or returning to the child's home; the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; whether there is a history of substance abuse by the child's family or others who have access to the child's home; whether the perpetrator of the harm to the child is identified; the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; whether the child's family demonstrates adequate parenting skills; and whether an adequate social support system consisting of an extended family and friends is available to the child. Tex. Fam. Code § 263.307.

### 1.  Unchallenged findings as to statutory grounds for termination

Initially, we note that Appellant has not challenged the sufficiency of the evidence supporting the court's findings that termination of his parental rights was proper because he: endangered S.E.W.'s physical or emotional well-being; failed to comply with the provisions of a court order that specifically established the actions necessary for him to obtain the return of S.E.W.; used a controlled substance in a manner that endangered S.E.W.'s health or safety and failed to complete a court-ordered substance abuse treatment program, or continued to abuse a controlled substance after completion of a court-ordered substance abuse treatment program.  *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P).  Evidence at trial supported the court's findings on the statutory grounds for termination.  The court heard evidence that Appellant had not seen S.E.W. since September or December 2017—a period of at least five months—and that Appellant refused to inform the Department where he was living, to undergo drug tests, to pay child support, to attend therapy, and to refrain from criminal activity.  There was evidence that S.E.W. was exposed to drugs, missed more days of school than she attended, and was not homeschooled.  The evidence supporting these statutory grounds for termination also constitutes evidence that termination of Appellant's parental rights is in S.E.W.'s best interest.  *See In re C.H.*, 89 S.W.3d at 28.

### 2.  Child's emotional and physical needs and emotional or physical danger

As to the emotional and physical needs of the child and any emotional or physical danger to the child, there was evidence that Appellant refused to comply with the Department's drug testing, to pay child support ordered by the court, and that his inability to avoid criminal activity resulted in his incarceration for most of S.E.W.'s fifth year and pending criminal charges.  *See In re*

13

*B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.) (noting that fact finder may measure parent's future conduct by his past conduct in determining whether termination of parental rights is in child's best interest); *In re A.W.T.*, 61 S.W.3d 87, 89 (Tex. App.—Amarillo 2001, no pet.) (concluding that "intentional criminal activity which exposed the parent to incarceration is relevant evidence tending to establish a course of conduct endangering the emotional and physical well being of the child"). Appellant articulated no plans for the future for him or for S.E.W. other than stating that he wanted her returned to him or to have visitation rights.

### 3. Parental abilities of those seeking custody, home stability, and child's desires

As to the parental abilities of the individuals seeking custody and the stability of the home or proposed placement, the court heard evidence that S.E.W. has bonded with Great Aunt and her young uncle, that S.E.W. is having all her needs met in Great Aunt's home, that S.E.W. is happy, attending school and therapy, and socializing well with friends, and that termination of Appellant's parental rights was in S.E.W.'s best interest. Great Aunt offers S.E.W. permanency, stability, and a safe and loving home. As to the desires of the child, there was evidence that S.E.W. wants to stay with Great Aunt, and the Department's plan is for S.E.W. to be adopted by her.

There were concerns that Appellant could not provide S.E.W. with a safe and stable home given his continued involvement in criminal activity. During the time that Appellant cared for S.E.W., she was exposed to drugs enough by the age of five to describe cocaine use. She missed numerous days of school that did not appear related to any illness or necessary medical attention, which ultimately led to her removal. Appellant withdrew her from school and S.E.W. was not homeschooled.

14

### 4. Parent's acts or omissions indicating parent-child relationship is not proper

As to the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper, there was evidence that Appellant has a history of assaultive conduct and domestic violence, including against Girlfriend, resulting in his incarceration during S.E.W.'s fifth year and when Mother died. *See In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (noting that parent's criminal history is non-dispositive factor in determining best interest of children); *In re A.W.T.*, 61 S.W.3d at 89. Appellant admitted that he had not provided child support for S.E.W., although he testified that he was employed as a landscaper, and he did not claim to have any agreement with his Grandfather or Great Aunt that no such assistance for S.E.W. was needed. *See Jordan v. Dossey*, 325 S.W.3d 700, 728 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (noting that there was no understanding that appellant would not be sending support for child because father could provide adequate support on his own); *see also In re T.L.S.*, No. 01-12-00434-CV, 2012 Tex. App. LEXIS 10297, at *14–15 (Tex. App.—Houston [1st Dist.] Dec. 13, 2012, no pet.) (mem. op.) (noting lack of evidence showing that appellant made arrangements to provide assistance or had reached agreement with her mother, as caregiver of appellant's children, that no such assistance was needed).

By the time of trial, Appellant had not had contact with S.E.W. for several months and he provided no support in the years leading up to her mother's death. During the case, Appellant failed to complete any services, refused to submit to drug testing, and his minimal visitation had a negative effect on S.E.W. emotionally. There was also concern, as Kimbro testified, that Appellant's desire to have S.E.W. in his home stemmed from her receipt of monetary benefits from the State.

15

Considering the entire record, we conclude that any disputed evidence could have been reconciled in favor of the court's findings, such that the court could have formed a firm belief or conviction that termination of Appellant's parental rights was in the child's best interest. *See* Tex. Fam. Code § 161.001(b)(2). Thus, the evidence in this record is factually sufficient to support the court's best-interest finding under section 161.001(b)(2) of the Family Code. We overrule Appellant's first issue.

**No preserved error as to admission into evidence of "Petitioner's Exhibits 6, 7 and 8"**

In his second issue, Appellant challenges the court's admission into evidence of "Petitioner's Exhibits 6, 7 and 8," which Appellant does not otherwise identify or describe. The record shows that these exhibits consisted of: certified copies of a 2016 complaint and arrest warrant alleging that Appellant assaulted Kenyatta Johnson (Petitioner's Exhibit 6); a complaint and arrest warrant alleging Appellant's attempted robbery of Stanley Harvey (Petitioner's Exhibit 7); and a certified copy of Appellant's indictment for the robbery of Stanley Harvey (Petitioner's Exhibit 8).[5] Appellant contends that the trial court's "evidentiary error" in admitting these exhibits prejudiced the court and led to the rendition of an improper judgment. We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005). A trial court abuses its discretion if it acts without regard for guiding rules or principles. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012).

---

[5] The trial court admitted into evidence Appellant's judgment of conviction, showing that he pleaded guilty to the lesser-included offense of assault in the cause involving Stanley Harvey.

16

At trial, Appellant did not object to any specific part of Exhibits 6, 7, or 8, but made only a blanket hearsay objection when they were offered: "And I would just object to hearsay included within those documents." A blanket hearsay objection that fails to identify which parts of the document contain the hearsay is not sufficiently specific to preserve error with respect to those parts. *In re C.C.*, 476 S.W.3d 632, 635 (Tex. App.—Amarillo 2015, no pet.); *L.M. v. Department of Family & Protective Servs.*, No. 01-11-00137-CV, 2012 Tex. App. LEXIS 5683, at *12 (Tex. App.—Houston [1st Dist.] July 12, 2012, pet. denied) (mem. op.).

Further, even if error had been preserved, we could not conclude on this record that the district court abused its discretion in admitting the evidence. A general objection to evidence as a whole, which does not point out specifically the objectionable portion, is properly overruled if any part of that evidence is admissible. *Speier v. Webster Coll.*, 616 S.W.2d 617, 619 (Tex. 1981); *L.M.*, 2012 Tex. App. LEXIS 5683, at *12. Certified copies of charging instruments fall within the public-records exception to the hearsay rule in Texas Rule of Evidence 803(8). *See* Tex. R. Evid. 803(8); *Adi v. Prudential Prop. & Cas. Ins. Co.*, No. 01-03-00063-CV, 2004 Tex. App. LEXIS 5937, at *8–9 (Tex. App.—Houston [1st Dist.] July 1, 2004, pet. denied) (mem. op.) (concluding that trial court did not abuse its discretion by denying plaintiff's motion to strike certified copy of capias and indictment relating to his arrest for engaging in organized criminal activity). In the underlying civil proceeding, the certified copies of Appellant's indictment, complaint, and arrest warrant were admissible as public records under Rule 803(8). Because Appellant made only a general objection to the entirety of Exhibits 6, 7, and 8 as hearsay, the trial court did not abuse its discretion by overruling that objection. Accordingly, we overrule Appellant's second issue.

17

**CONCLUSION**

We affirm the trial court's order of termination.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Pemberton and Field

Affirmed

Filed:   August 29, 2018