**REVERSE and RENDER and Opinion Filed August 23, 2019**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00979-CV

### BELL HELICOPTER TEXTRON, INC., Appellant
### V.
### SHIRLEY DICKSON, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF BILLY DICKSON, DECEASED, RANDALL C. DICKSON, DARYL W. DICKSON, DEANA K. BOAZ KIZER, Appellees

**On Appeal from the 95th Judicial District Ct**
**Dallas County, Texas**
**Trial Court Cause No. DC-12-05995-D**

## MEMORANDUM OPINION
Before Justices Bridges, Brown, and Whitehill
Opinion by Justice Bridges

Bell Helicopter Textron, Inc. appeals the trial court's judgment awarding damages and post-judgment interest to appellees Shirley Dickson, individually and as representative of the estate of Billy Dickson, deceased, Randall C. Dickson, Daryl W. Dickson, and Deana K. Boaz Kizer on their claims arising from Billy Dickson's death from mesothelioma. In four issues, Bell argues the evidence is legally and factually insufficient to support the jury's findings on the causation elements of appellees' gross negligence claim, the trial court erred by excluding evidence of Billy's asbestos exposure at locations other than Bell, and the trial court erred in applying the exemplary damage cap. We reverse the trial court's judgment and render judgment that appellees take nothing on their claims.

On May 30, 2012, appellees filed in the 191st District Court in Dallas County an original asbestos petition and jury demand asserting, among other things, that Billy suffered from mesothelioma and alleging claims of products liability, strict products liability, negligence, and gross negligence against seven defendants. Billy was an engineer at Bell from 1962 to 1968 who did not perform any hands-on work with asbestos-containing materials but who supervised others who built testing enclosures that Billy designed. Bell was not one of the named defendants. On July 2, 2012, the case was transferred by the Multidistrict Litigation Panel to the 11th District Court in Harris County. On February 27, 2013, appellees filed their second amended petition naming Bell as a defendant. On December 15, 2013, Billy died.

On June 11, 2014, plaintiffs' fourth amended petition was filed naming as plaintiffs Billy's wife and three children ("appellees"). As the case progressed, appellees settled some of their claims and dismissed others, leaving Bell as the only defendant. Appellees' claim against Bell was limited to a claim of gross negligence. Prior to trial, the case was transferred back to Dallas County.

At trial, Dr. Edwin Holstein testified he is a medical doctor with specialties in internal medicine and preventative medicine with a subspecialty in occupational medicine. Holstein testified he taught both medical doctors and industrial hygienists about asbestos and other dusts that can be harmful to humans. Holstein testified he reviewed Billy's medical records and deposition testimony. Holstein testified the term "bystander exposure" was relevant to Billy's case because Billy was an engineer at Bell and, because of union rules, he was not allowed to touch any tools. As a result, Billy was a bystander to the work performed by others in constructing enclosures for testing work, allegedly exposing Billy to asbestos, and he stood "a foot or two or five or eight feet away from the work they were doing." Holstein testified the "bottom line" was that, "for the exposures that [Billy] had at Bell, he was a bystander." Following extensive additional testimony

concerning Holstein's training and experience, the trial court certified Holstein as an expert on issues of occupational and preventative medicine, particularly the causation of asbestos-related diseases generally and specifically "the asbestos-related disease that Billy Dickson was diagnosed with and the causation thereof."

Holstein testified he had reviewed Billy's deposition and described Billy's exposure to asbestos at Bell as "intermittent" with "relatively brief periods of exposure" during which "the exposure would be intense." The exposures occurred "several times per month for about six years." In testing helicopter components, Bell constructed enclosures to insulate the surrounding area from the heat that was generated during testing. Holstein testified, "According to [Billy's] testimony, they used an asbestos-containing millboard," which was "a little bit like a wall panel, Sheetrock about half an inch thick typically and comes in sheets." Holstein testified they used the millboard to construct the enclosures, and the millboard was "between 25 percent and 75 percent asbestos." Bell's counsel objected that there was no foundation for this testimony and "no evidence of that in [Billy's] testimony and far exceeds that." The trial court sustained counsel's objection. Holstein then was asked if, based upon his review of Billy's testimony, he could "get an indication . . . as to what type of asbestos-containing insulation boards he was – he was identifying?" Holstein responded that Billy did not give a brand name, and Holstein could not "assign a brand name," but Holstein testified "asbestos-containing millboard for purposes of insulation was a standard product." Holstein testified there were "only approximately five manufacturers of it," and he relied on "certain studies" concerning the "composition of those millboards" and the "air concentration that stemmed from the cutting of those millboards."

In response to questioning, Holstein agreed that the studies he relied upon were "the 1970 study done by Carter," the "1999 study on Micarta panel work simulation practices by Hatfield and Longo," the "Marinite board study" in "May 2001 by Hatfield and Longo," and a study in

1989 in Virginia on behalf of the E.P.A. Holstein testified he was able to make an approximation of Billy's asbestos exposure at Bell based on Billy's deposition testimony detailing his work history. Holstein described Billy's work history as follows:

> Okay. So he was an engineer. He designed the enclosures, and then he took his plans to the workmen and said, I want you to build these enclosures for this experiment we're now going to do on the helicopter component in order to insulate it because there's going to be a lot of heat in there, so we need to build this enclosure to keep the heat in. And then he would come into the laboratory area and he would supervise it to make sure it was being built correctly. He testified he spent about half of his work day for six years, from 1962 to 1968, about half of each work day was spent in that area. But they weren't building these enclosures every time he was there, that was something that he might supervise three or four times a month on average. And when he would be supervising it, he might be there for half an hour. Sometimes it was 15 minutes, sometimes it was 45 minutes, but on average about half an hour.

Holstein testified Billy's asbestos exposure at Bell "Considerably more than doubled his risk of getting mesothelioma, which ultimately he did get."

Holstein testified concerning the history of medical studies into the effects of asbestos, beginning with a 1927 medical article describing a person who had worked with asbestos and died from scarring of the lungs. Holstein testified the Walsh-Healey Act was passed in 1951, Bell was required to comply with the Act, and the Act restricted asbestos exposure to 5 million particles per cubic foot. Holstein testified a 1958 Texas law also limited asbestos exposure to 5 million particles per cubic foot, and Bell would have been on notice as to the hazards of asbestos no later than 1951. In 1960, the publication of an article reporting 33 cases of mesothelioma established beyond a reasonable doubt that asbestos caused asbestosis, lung cancer, and mesothelioma.

On cross-examination, Holstein agreed Billy's deposition testimony was that the cutting of asbestos board occurred ten or twenty times or "more" but it could not have been as many as a hundred times. Holstein testified his calculation that the board cutting occurred 252 times was "an approximation," and Billy's testimony elsewhere in his deposition supported the higher number. Bell's counsel asked if Holstein was aware Bell had a record retention policy under which

–4–

documents were only kept for thirty years, and Holstein said he was not aware of Bell's policy. Holstein conceded "there would be no surprise" Bell did not have corporate documents from the 1960s for Holstein to review if Bell has a 30-year document retention policy. Holstein agreed that Billy was an engineer who designed the enclosures and who was responsible for "making sure the heat enclosure would work."

The jury subsequently found by clear and convincing evidence that the harm to Billy was proximately caused by the gross negligence of Bell. The trial court rendered judgment on the verdict and denied Bell's motion for new trial. This appeal followed.

In its first issue, Bell argues the evidence is legally insufficient to support the jury's findings on the objective, subjective, and/or causation elements of appellees' gross negligence claim.

In section 408.001, the labor code provides that "[r]ecovery of workers' compensation benefits is the exclusive remedy of an employee ... or a legal beneficiary against the employer for the death of ... the employee." TEX. LAB. CODE ANN. § 408.001(a). Paragraph (b) of that section provides that "[t]his section does not prohibit the recovery of exemplary damages by the surviving spouse or heirs of the body of a deceased employee whose death was caused . . . by the employer's gross negligence." Id. § 408.001(b). Section 408.002 provides, "A right of action survives in a case based on a compensable injury that results in the employee's death." These three provisions generally prohibit an employee receiving workers' compensation benefits or his beneficiaries from bringing suit against the employer for actual damages. However, the provisions permit the spouse and heirs of a deceased employee to bring suit for the death of the employee and to recover exemplary damages from the employer for its gross negligence notwithstanding the fact that workers' compensation benefits were paid for the employee's death. *See Wright v. Gifford–Hill*

& Co., 725 S.W.2d 712, 714 (Tex.1987); *City of Dallas v. Gatlin*, 329 S.W.3d 222, 226 (Tex. App.—Dallas 2010, no pet.).

In reviewing an award for exemplary damages, we conduct a legal sufficiency review under the "clear and convincing" evidence standard. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012). "'Clear and convincing' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. CIV. PRAC. & REM. CODE § 41.001(2); *Waldrip*, 380 S.W.3d at 137. The standard for legal sufficiency works in tandem with the standard of review—"whenever the standard of proof at trial is elevated, the standard of appellate review must likewise be elevated." *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005) (quoting *S.W. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 627 (Tex. 2004)). Accordingly, our legal sufficiency review must consider *all* the evidence. *Id.*

Gross negligence consists of both objective and subjective elements. *Waldrip*, 380 S.W.3d at 137. Plaintiffs must prove by clear and convincing evidence that 1) when viewed objectively from the defendant's standpoint at the time of the event, the act or omission involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others and 2) the defendant had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others. *Id.*

Under the objective component, "extreme risk" is not a remote possibility or even a high probability of minor harm, but rather the likelihood of the plaintiff's serious injury. *Id.* The risk must be examined prospectively from the perspective of the actor, not in hindsight. *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 248 (Tex. 2008). The subjective prong, in turn, requires that the defendant knew about the risk, but that the defendant's acts or omissions demonstrated indifference to the consequences of its acts. *Waldrip*, 380 S.W.3d at 137. In essence,

appellees must establish that Bell was aware that the cutting of boards and Billy's supervision of the construction of enclosures posed an extreme degree of risk and that Bell had actual, subjective awareness that Billy could develop mesothelioma as a result of supervising the construction but nevertheless proceeded to allow Billy to supervise the construction. *See id.*

Here, the evidence showed Billy himself designed the testing enclosures and supervised their construction. Billy was a "bystander" to the construction process. In his deposition, Billy testified he did not know where the boards he used for the enclosures came from. Billy did not know any specific brand name associated with the boards, and there were no labels, tags, or packaging he saw with the boards. When asked how he gained an understanding or belief that the boards contained asbestos, the following exchange occurred:

> Billy: Well, based on what it – what the inside of the boards looked like, they later determined that that's what asbestos looks like, fibers.
>
> Q: When did you determine that?
>
> Billy: Oh, it was recently.
>
> Q: How did you determine that?
>
> Billy: The last few years.
>
> Q: What was the source of information that brought you to that conclusion?
>
> Billy: Well, it's just that I've learned what it looked like.

Based on a review of Billy's deposition testimony, Holstein concluded the millboard used in the construction of the testing enclosures contained asbestos and was "a standard product" produced by "only approximately five manufacturers." In extrapolating Billy's approximate asbestos exposure at Bell based on Billy's deposition testimony detailing his work history, Holstein relied

on studies conducted in 1970 and later years. Holstein testified Bell would have been on notice as to the hazards of asbestos no later than 1951.[1]

However, Holstein offered no testimony concerning what Bell knew about the millboard used to construct testing enclosures between 1962 and 1968 when Billy was supervising the construction. Billy himself did not know until a "few years" before his deposition that the "inside of the boards looked like" asbestos. Thus, Billy did not know at the relevant time that the boards might contain asbestos, and there is no evidence that Bell knew of a risk to him but proceeded to allow Billy to use asbestos-containing boards. Bell's knowledge of the "hazards of asbestos" generally is no evidence that Bell was aware that the cutting of boards and Billy's supervision of the construction of enclosures posed an extreme degree of risk to Billy and that Bell had actual, subjective awareness that Billy could develop mesothelioma as a result of supervising the construction but nevertheless proceeded to allow Billy to supervise the construction. *See id.* Further, all of the studies Holstein relied upon in approximating Billy's asbestos exposure were conducted after the relevant 1962 to 1968 time period and were no evidence of Bell's awareness of an extreme risk posed by the cutting of the boards between 1962 and 1968. The risk must be examined prospectively from Bell's perspective, not in hindsight. *See Hogue*, 271 S.W.3d at 248. We conclude appellees presented no evidence to prove by clear and convincing evidence either the objective or subjective elements of gross negligence. *See Waldrip*, 380 S.W.3d at 137. We sustain Bell's first issue. Because of our disposition of Bell's first issue, we need not address Bell's remaining issues.

---

[1] There is no evidence in the record that Bell failed to comply with any laws imposing limits on asbestos exposure. Holstein acknowledged that it was unlikely Billy was ever exposed to asbestos in excess of the limitations on exposure of the Walsh-Healey Act or Texas law. Further, Holstein testified that Billy would "almost certainly not have had exposures that on an eight-hour time-weighted average basis would have gone above the 5 million particles per cubic foot of the Walsh-Healey Act."

We reverse the trial court's judgment and render judgment that appellees take nothing on their claims.

/David L. Bridges/
DAVID L. BRIDGES
JUSTICE

170979F.P05



## Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

BELL HELICOPTER TEXTRON, INC.,
Appellant

No. 05-17-00979-CV          V.

SHIRLEY DICKSON, INDIVIDUALLY
AND AS REPRESENTATIVE OF THE
ESTATE OF BILLY DICKSON,
DECEASED, RANDALL C. DICKSON,
DARYL W. DICKSON, DEANA K.
BOAZ KIZER, Appellees

On Appeal from the 95th District Court,
Dallas County, Texas
Trial Court Cause No. DC-12-05995-D.
Opinion delivered by Justice Bridges.
Justices Brown and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **REVERSED** and judgment is **RENDERED** that:

Appellees Shirley Dickson, individually and as representative of the estate of
Billy Dickson, deceased, Randall C. Dickson, Daryl W. Dickson, and Deana K.
Boaz Kizer take nothing on their claims.

It is **ORDERED** that appellant Bell Helicopter Textron, Inc. recover its costs of this appeal from appellees Shirley Dickson, individually and as representative of the estate of Billy Dickson, deceased, Randall C. Dickson, Daryl W. Dickson, and Deana K. Boaz Kizer.

Judgment entered August 23, 2019.