**AFFIRMED and Opinion Filed June 21, 2021**



In The

# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-19-01007-CV

## IN RE COMMITMENT OF MARCUS QUIN BUTLER

**On Appeal from the 282nd Judicial District Court
Dallas County, Texas
Trial Court Cause No. CV-1870003-S**

## MEMORANDUM OPINION
Before Justices Molberg, Reichek, and Nowell
Opinion by Justice Reichek

After a jury found Marcus Quin Butler is a sexually violent predator as defined by Chapter 841 of the Texas Health and Safety Code, the trial court rendered judgment civilly committing him for treatment and supervision upon his release from prison. In seven issues on appeal, Butler brings complaints about the legal and factual sufficiency of the evidence to support his commitment, evidentiary rulings, and charge error. We overrule all issues and affirm the trial court's judgment.

## BACKGROUND

In 1999, the Texas Legislature enacted the Civil Commitment of Sexually Violent Predators Act to provide a "civil commitment procedure for the long-term supervision and treatment of persons determined to be sexually violent predators."

*See* TEX. HEALTH & SAFETY CODE ANN. § 841.001. The Act applies to persons with a "behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the [person] likely to engage in repeated predatory acts of sexual violence." *Id*.; *In re Commitment of Bluitt*, 605 S.W.3d 199, 200 (Tex. 2020). The decision to pursue a civil commitment under the Act is made by "the attorney representing the state for the county in which the person was most recently convicted of a sexually violent offense." TEX. HEALTH & SAFETY CODE ANN. §§ 841.023, .041; *Bluitt*, 605 S.W.3d at 201. Before that decision is made, however, the person is assessed by a multidisciplinary team (MDT) established by the executive director of the Texas Department of Criminal Justice, and the assessment shared with the state's attorney who decides whether to file suit. *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.022, .023, .041. If a judge or jury determines the person is a sexually violent predator (SVP), the trial court must commit the person for treatment and supervision to begin on the date of release from prison and to continue "until the person's behavioral abnormality has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence." *See id*. § 841.081(a).

In 2017, Butler was serving a four-year sentence for sexual assault—his second conviction for a sexually violent offense. Several months before his scheduled release, the State filed a petition in Dallas County alleging Butler was a sexually violent predator as defined by the statute and sought to have him committed for treatment and supervision.

The case went to trial in May 2019. Three witnesses testified: an expert for the State, an expert for the defense, and Butler. After hearing the evidence, the jury found Butler was a sexually violent predator and, in accordance with the Act, the trial court ordered him committed for treatment and supervision until his behavioral abnormality has changed to the extent Butler is no longer likely to engage in a predatory act of sexual violence. This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In his second and third issues, Butler contends the evidence is legally and factually insufficient to support his commitment. In his fourth issue, he contends the State's expert used an incorrect definition of "behavioral abnormality."

### A. Legal Standard

To warrant a person's commitment as sexually violent predator, the State must prove beyond a reasonable doubt that the person is (1) "a repeat sexually violent offender" and (2) "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." TEX. HEALTH & SAFETY CODE ANN. §§ 841.003(a), 841.062(a). A person is a repeat sexually violent offender if he has been convicted of more than one sexually violent offense and a sentence was imposed for at least one of the offenses. *Id*. § 841.003(b). The undisputed evidence showed Butler was convicted of and imprisoned for two sexual assaults, offenses which are included in the defined list of sexually violent offenses. *See id*.

§ 841.002(8)(A) (defining "sexually violent offense"). Therefore, he is a repeat sexually violent offender.

A "behavioral abnormality" is a "congenital or acquired condition that, by affecting a person's emotional or volitional capacity," predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id*. § 841.002(2). A "predatory act" is an "act directed toward individuals, including family members, for the primary purpose of victimization." *Id*. § 841.002(5).

Although the commitment of a person as a sexually violent predator is a civil proceeding, we use the criminal test for legal sufficiency. *In re Commitment of Hill*, 621 S.W.3d 336, 339 (Tex. App.—Dallas 2021, no pet.). We review the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the required elements beyond a reasonable doubt. *Id*. It is the factfinder's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts. *Id*.

On a factual sufficiency review, we determine whether, on the entire record, a reasonable factfinder could find beyond a reasonable doubt that the defendant is an SVP. *In re Commitment of Stoddard*, 619 S.W.3d 665, 668 (Tex. 2020). In so doing, we may not usurp the jury's role of determining credibility of witnesses and the weight to be given their testimony, and we must presume that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do

–4–

so. *Id.* "If the remaining evidence contrary to the finding is so significant in light of the entire record that the factfinder could not have determined beyond a reasonable doubt that its finding was true, the evidence is factually insufficient to support the verdict." *Id*.

## B. Factual Background

Dr. Timothy Proctor was hired by the Special Prosecution Unit to evaluate Butler. Proctor is a board-certified forensic psychologist who, at the time of trial, had performed about 100 behavioral abnormality evaluations since 2006. Proctor opined that Butler suffers from a behavioral abnormality that makes him likely to engage in predatory acts of violence.

In formulating his opinion, Proctor reviewed and relied on hundreds of pages of records relevant to Butler, including police reports, indictments and judgments, court documents, prison and jail records, juvenile records, and depositions of Butler and Butler's expert. These records also included a report by Dr. Stephen Thorne, a psychologist who conducted the pre-suit MDT evaluation of Butler and opined that Butler has a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence. Proctor also had a 2 ½-hour, face-to-face interview with Butler. Finally, he used tests or other actuarial measures, such as the Static-99R, the RSVP, and the Psychopathy Checklist Revised (PCLR), to assess Butler's risk for reoffending. From all of this information, he identified a number of risk factors for Butler, including sexual deviance, persistence after punishment, escalation of sexual

–5–

violation, chronicity of sexual violence, physical and psychological coercion and sexual violence, a history of attitude condoning sexual violence, unrelated sexual victims, history of nonsexual violent convictions, an anti-social lifestyle, extreme minimization, absence of sex offender treatment, and problems with self-awareness, intimate relationships, friendships, and maintaining employment. He identified no "protective" factors to lessen his risk.

Proctor began by explaining sexual deviance, which, as relevant here, he defined as "sexual interests behaviors against non-consenting persons" and setting out Butler's prior sexual offenses. Butler's first sexually-related offense involved the stalking of a female acquaintance, D.C. In August 2012, D.C. reported that Butler had been harassing her over a period of time during which he repeatedly pressured her to have sex with him and threatened her life if she refused to comply. D.C. reported that Butler showed up at her residence with a shotgun, "racked it," and told her he "had something for her." On another occasion, he threatened her with a gun wrapped in a towel. At one point, he hit her in the face and split her lip.

When the police questioned Butler about the stalking of D.C., they also questioned him about the sexual assault of another acquaintance, 17-year-old K.W. This assault occurred four days after D.C.'s stalking report; Butler was thirty years old at the time. In this incident, Butler again wrapped a gun in a towel but this time used it to force K.W. to perform oral sex on him and to submit to vaginal intercourse. When police confronted Butler with K.W.'s allegations, he did not deny them.

Ultimately, Butler pleaded guilty to stalking D.C. and sexually assaulting K.W. and was sentenced to three years in prison.

One week after his release from prison, Butler found D.C. and actually did to her "what he threatened to do" three years earlier—he sexually assaulted her. According to Proctor, the reports showed that Butler slapped D.C., ripped her clothes off, and told her she was going to give him money or sex to make up for his time in prison. After he sexually assaulted her, he told her she took three years of his life and he was "entitled to this." Again, Butler pleaded guilty to sexual assault and a charge of failure to register as a sex offender and was sentenced to four years in prison.

When Proctor asked Butler about the offenses, he denied committing them. With respect to D.C., he said there was a time he assaulted her but, during the relevant time period, they were in a relationship or were "friendly" with each other, and he did not "force himself" on her, threaten her, or use a gun. As for K.W., he said she was a prostitute with whom he started a relationship. He claimed she was mad at him and made up the allegations. He claimed sex with her was "totally consensual."

Proctor believed the details of Butler's offenses were important because they showed the threat of force to gain sexual interaction. Most striking, he said, is the sexual assault of D.C., who he previously threatened and was sent to prison, and then carried out the threat when he was released. He said that Butler's "thinking" that

–7–

D.C. "owed" him something after he served a prison term indicated an increased risk for sexual offending. Further, he explained that a "big risk factor" for reoffending is being "persistent after punishment." As he explained, a person generally is deterred if he "gets caught" and "gets in a lot of trouble." So, for someone to be released and reoffend is "worrisome enough . . . but then to offend against to [sic] the very victim that they were threatening that led to them going to prison the first time, doing the very thing they threatened. And it would be even similar to what he had done with [K.W.]. That whole pattern is certainly very concerning."

Proctor went on to say Butler's offenses show a "continued pattern of force, forcing sex, hitting and using physical force to obtain it" and reflect an escalation in sexual violence, a history of an attitude condoning sexual violence, and physical and psychological coercion. Moreover, D.C. and K.W. are unrelated, which Proctor said increases his risk because the "victim pool" is larger than when a person offends only against related people. Proctor said Butler's offenses show a person who has "serious difficulty" controlling his behavior, has issues with his emotional capacity, how he interacts with people, what he expects of others, and his decision making.

Proctor testified over objection that, as part of his evaluation, he made a "rule out" diagnosis of sexual sadism. Sexual sadism means being sexually aroused by causing someone else physical pain or harm or scaring them. Proctor explained that when there are sexual assault/rape type offenses involving force, the question is whether the force is "just about gaining compliance or is it going beyond that and

that's part of what's arousing the offender." Here, he said, Butler's offenses involve violence and threats in a way that made him question if those are part of Butler's "gratification" to the "point of sadism." With a "rule out" diagnosis, Proctor said he did not have enough evidence to "get over the threshold and fully diagnose it" but believed future medical professionals should consider it further to completely exclude or rule it out. Proctor also testified, over objection, that Thorne made the same rule-out diagnosis.

In addition to Butler's sexual offenses, Proctor also considered his non-sexual criminal history. He explained that the two biggest risk factors in these types of cases are sexual deviance and an anti-social lifestyle, which means "getting into trouble, breaking the rules, not following rules, laws, et cetera." Butler has been incarcerated eleven times for a range of offenses—burglary of a building, assault on a public servant (a correctional officer), unauthorized use of a motor vehicle, possession and delivery of a controlled substance, theft of property, driving without a license, failing to ID, and giving false information, theft by check, in addition to the stalking and sexual assaults. He has been to prison five times and was held in a juvenile facility as a youth. According to Proctor, this history shows an anti-social lifestyle.

Proctor said Butler has "institutional adjustment" issues that include sexual misconduct across multiple incarcerations, dating back to his juvenile years, all of which shows he cannot follow rules even in a prison designed to keep people in line.

He has several reports of exposing himself to female staff or masturbating where someone could see or looking officers in the eye while doing it. Proctor said the "targeting" of individuals for these sexual misconduct violations is the "problem" and they continue to occur "in an aggressive kind of way." He rejected Butler's suggestion that he engaged in this type of misconduct simply to obtain a different housing assignment in prison. Other misconduct violations include making threats, assault, not following orders, and possessing contraband.

Proctor diagnosed Butler with anti-social personality disorder, which means he has problems with repeatedly breaking the law, not following rules, engaging in aggressive and reckless behavior, being dishonest, and thrill seeking. In addition, he said Butler is psychopathic, which is a more severe type of anti-social personality. Proctor said Butler's anti-social personality and psychopathy are "driving" the sexual deviance, sexual misconduct, and sexual offending that have been present throughout his life. The disorder is a congenital or acquired condition that can affect one's emotion or volitional capacity and can predispose a person to commit sexually violent offenses. While there may be "less acting out" as a person ages, Proctor said that a person's personality, once in place, is "stable."

In addition to information obtained from Butler and in his records, Proctor also discussed the testing or actuarial measures he used in this case to assess risk: the Static 99R, the RSVP, and the PCLR. Proctor explained each test or measure and how he scored Butler. The Static-99R is an actuarial instrument that takes into

account ten "static" risk factors associated with sexual offense recidivism. Butler scored a "7," which put him in the highest of five risk levels—well-above average risk range— when compared to other sex offenders. Proctor used the PCLR to assess his level of psychopathic traits or characteristics. Butler scored 36 out of 40, which put him in the 99th percentile, meaning he scored higher than 99 percent of other inmates. Finally, Proctor said he identified several dynamic risk factors for Butler using the RSVP. For example, Butler showed a lack of self-awareness of his problems, had a history of short, chaotic, unstable relationships, had an unstable employment history, and had problems getting into trouble while on probation, parole, or while incarcerated. In fact, one of his convictions involved the assault of a correctional officer while he was confined in a juvenile facility. He also minimized his actions and denied committing any of the offenses. Another identified risk factor was that Butler had not had sex offender treatment and did not think he needed it, even though treatment can reduce the risk of reoffending.

In sum, Proctor testified that the "makeup" of Butler's behavioral abnormality is a personality that is anti-social and psychopathic and that takes what he wants and does not worry about the consequences. Proctor said it "comes out in criminal offending in general, but it has come out repeatedly in sexual offending, in terms of sexual misconduct, but specifically in his sexually violent offenses." He said Butler's personality drives this history and results in him being at a "high risk, a well above average risk of reoffending."

Butler testified he did not consider himself a sex offender. On questioning by the State, he went through his criminal history. While he acknowledged various convictions, he denied the multiple sexual misconduct violations committed while in either juvenile or adult facilities and that involved exposing himself to and masturbating in front of female staff. Despite the violations and his multiple convictions, Butler did not believe that he had a problem following the law or with authority. Although he said he believed he would be able to follow the law if released from prison, he also acknowledged getting disciplined only two weeks earlier for possessing a weapon. He also acknowledged that he had not received any sex offender treatment and believed he did not need any. He denied committing the offenses against D.C. and K.W.

After Butler's testimony, the State rested. Butler called Dr. Marissa Mauro as his only witness. Mauro, a forensic psychologist, has been performing behavioral abnormality assessments since 2011 and had done close to 200. In about 70 percent of those cases, she found the person had a behavioral abnormality. She was retained by the State Counsel for Offenders to assess Butler. Like Proctor, Mauro reviewed the hundreds of pages of Butler's records, interviewed Butler for more than four hours, and completed the Static-99R, the Static-2002R, and the PCLR. Unlike Proctor, Mauro concluded that Butler did not suffer from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

In her interview with Butler, they discussed his adjustment to prison and his disciplinary violations; his early childhood, including school, family, and child abuse; his legal problems from the juvenile to adulthood; medical and mental health issues; substance use; interpersonal relations, including his children and girlfriends. Mauro said they also spoke about his general feelings—anger, emotions, impulsivity—as well as a detailed sexual history.

Butler recounted a chaotic early childhood. His mother went to prison when he was a newborn and he lived with his father and his stepmother for some time. When he was about twelve years old, he went back into the care of his mother and was in and out of her home. She would frequently kick him out and have him live with relatives. At times, he lived on the streets and at others, he lived in group homes. He did not have money for basic necessities and would often steal for clothing and food. He was physically abused by his aunts and cousins and, Mauro said, there was probably emotional abuse and neglect.

He was fourteen years old at the time of his first arrest. The offense was burglary of a building. He was put on probation but was revoked and placed in Texas Youth Council. She said his adult criminal history is "very extensive," but most are general criminal offenses, not sexual offenses. He has several commitments or evaluations in prison psychiatric facilities for claiming suicide ideation and attempt and has been treated with a number of medications.

As far as personal relationships, he reported that he never married but had perhaps 100 sexual partners. He said he has many children by various women. He has cheated on all the women he has been with, and no relationship lasted "very long or [was] committed."

She acknowledged a number of disciplinary violations while incarcerated over the years, including some sexual misconduct cases, exposure cases, and masturbating in public. But, she said, he has had few cases during his latest incarceration. There were no records indicating Butler had a history of exposing himself once he was out of prison.

As for the two sexual assaults, Mauro said appellant denied committing them. With respect to K.W., Mauro said she "accepted as fact" that appellant pleaded guilty to sexual assault, but for purposes of determining a behavioral abnormality and considering diagnosis and risk, she considered that K.W. was a "known acquaintance," was "consensually hanging out with him," and there was "no indication" that Butler "was getting any sort of arousal from any type of force on non-consenting sexual activity." Mauro testified that even in K.W.'s version of events, she "stayed the night" and did not have him take her home until the following morning. Thus, she considered this an "unusual case," noting "even the amount of time that he was given" as punishment was unusual.

As for the second sexual assault, Mauro said D.C. "made a number of conflicting statements" to police over time. She said that in her statements about the

stalking and sexual assault cases, she has described Butler as both an ex-boyfriend and as a person who made sexual advances toward her and she refused. Mauro said these cases are not typical because the sentences were "significantly shorter" than what she typical saw. Also, she said they did not involve child victims, and adult sexual assault cases generally tend to involve "stranger victims," unlike here where the parties knew each other.

Based on her interview with Butler and her evaluation of the records, she opined that Butler did not suffer from a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence. In particular, she did not believe he had a condition that made him likely to commit a sexual offense. Although she diagnosed him with anti-social personality disorder, she did not believe that condition would cause him to be likely to commit sexually violent offenses in the future nor did she believe it predisposed him to "become a menace to the health and safety of another person." She said anti-social personality disorder is prevalent in the inmate population, and the majority of people in prison do not have convictions for sexually violent offenses, despite meeting the criteria for the diagnosis. Thus, she said it would not make sense in the "context of talking about a small but extremely dangerous population," which is a reference to the legislative findings found in the statute. Mauro said she viewed Butler "as being more of a typical criminal recidivist" with an extensive criminal history, most of which is not sexual. She said she did not make a paraphilia diagnosis, and neither did Drs. Proctor nor

Thorne, even though one normally finds such a diagnosis in the case of someone who suffers from a behavioral abnormality.

She also disagreed with Proctor's "rule out diagnosis" of sexual sadism because she believed there was no indication from the records that Butler had some type of sexual preference or arousal pattern for pain, humiliation and torture of others. She said that while a "certain degree of force" is involved in sexual assault cases, that degree of force by itself does not prove sadism. She saw nothing in the "sex acts" involved in Butler's cases that showed sadism, explaining that he did not torture K.W. or D.C, whip them, spank them, humiliate them, leave them half naked, or hog tie them. She also said if you "accept allegations" that he used a gun to gain compliance, "that would be reasonable force to commit any sexual assault, any rape, to use a gun to get the sex." She also relied on Butler's version of why and how he used the gun. She explained that sadism is "assigned" where there is a "preference for the torture, humiliation or inducing pain in other people in the course of sexual activity or sexual arousal even to that activity." A traditional sex act is not necessarily required because a sadist might get sexually aroused from the pain, humiliation, and torture of other people without actually engaging in any sex act.

As for testing, she scored Butler at 28 on the PCLR, which she interpreted as "mixed psychopathic traits." She said Butler fell below a score of 30, which is the score that is considered consistent with psychopathy. She did not believe he was a psychopath so she did not believe it is a factor in this case that would make him

likely to reoffend sexually. She also scored the Static 99R and 2002R but said neither tests for behavior abnormalities and do not apply to Butler specifically. She score Butler at a 6 on the Static 99R, which she acknowledged placed him as a "well above average risk." She did not use the RSVP test utilized by Proctor. Finally, she disagreed with most of the risk factors found by Proctor, including sexual deviance, although she later agreed that forcing a woman to perform a sex act is a sexually deviant act. She also believed other risk factors were duplicated on some of the testing or were "false" factors. Apart from the testing instruments she used, Mauro found only one risk factor—Butler has anti-social personality disorder. Although she said that traits associated with the disorder do increase his risk, the disorder primarily increases his risk for general criminal recidivisms. She believed it was "very important" that Butler did not have a paraphilia, which would increase his risk. Like Proctor, she did not find any "protective factors" for Butler that would lessen any risk.

## C. Analysis

In his legal sufficiency complaint, Butler argues that the evidence supports only a finding that he is a psychopath with an "above average risk of continuing his free-world non-sexual criminal lifestyle which might include a handful of sex offenses that can be counted on the fingers of one hand and result in generous plea bargains" but does not rise to the level making him one of the "worst of the worst" or "extremely dangerous" sex offender.

Before addressing his sufficiency arguments, we first note that Butler's brief provides little more than a skeleton of the facts developed at his trial. Moreover, he devotes several pages in his brief to the argument that "legislative findings" in section 841.001 should inform our analysis in this case.[1] Relying on the Fort Worth Court of Appeals' decision in *In re Commitment of Stoddard*, 601 S.W.3d 879 (Tex. App.—Fort Worth 2019), *rev'd*, 619 S.W.3d 665 (Tex. 2021), he urges us to construe the SVP Act to apply only to the "worst of the worst" or to "extremely dangerous sex offenders," which he contends would not include him. Since the filing of his brief, however, the Texas Supreme Court has rejected that approach, explaining that "[t]hat is simply not what the Act requires the State to prove." *In re Commitment of Stoddard*, 619 S.W.3d at 678. As the court explained, language contained in the legislative findings is not part of the definition of "sexually violent predator" and is not an element the jury was required to find. *Id*. at 677.

With this in mind and as set out above, Proctor testified extensively about the records he reviewed, his interview with Butler, the testing and actuarial measures he used, and the risk factors he identified that led to his opinion that Proctor suffered a behavioral abnormality that makes it likely he was engage in predatory acts of sexual violence. In short, Proctor stalked a woman, threatened to kill her if she did not

---

[1] For example, one such legislative finding is that "a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence[.]" *See* TEX. HEALTH & SAFETY CODE ANN. § 841.001.

submit to his sexual advances, and went to prison for it. Almost immediately on release from prison, he found the woman and did what he threatened to do—he sexually assaulted her—believing he was "entitled" to because he had spent three years in prison. He was also imprisoned for sexually assaulting a 17-year-old, who he forced into oral and vaginal sex acts at gunpoint. In addition to these crimes, Butler had a long criminal history, dating back to his days as a juvenile, and included numerous sexual misconduct violations while incarcerated for exposing himself and masturbating in front of female staff. Both Proctor and Mauro diagnosed him with anti-social personality disorder; Proctor also believed he was psychopathic. Proctor explained Butler's risk factors, what made them risk factors, and provided testimony about the actuarial tools and what the scores meant. Having reviewed this evidence in a light most favorable to the verdict, we conclude a rational factfinder could have found beyond a reasonable doubt that Butler has a behavior abnormality that makes him likely to engage in predatory acts of sexual violence. We overrule the second issue.

In his third issue, Butler argues the "risk of injustice" is too great to allow the verdict to stand because it "could easily have been based on a pseudo diagnosis (amounting to nothing more than speculation) that [he] is a sexual sadist and on a grossly exaggerated number of risk factors." He also suggests that "ambiguous and contradictory victim statements" and the "generous plea bargains" weigh in his

–19–

favor. Again, he relies on the Fort Worth court's decision in *Stoddard*, which we have already explained was reversed by the supreme court.

As set out above, Proctor did not diagnose Butler with sexual sadism; rather, he explained his concerns but said he did not have the information to rule it out. As for risk factors, the jury saw Proctor's list of risk factors and heard his explanation as to each one. While Mauro disagreed with Proctor, it was the jury's function to resolve any credibility issues and weigh the evidence. Finally, whether Butler benefited from "generous plea bargains" in his sexual assault cases is simply not relevant to the issue here.

The jury heard from Butler as well as both experts and had the opportunity to evaluate the credibility of all of them. They heard extensive evidence from Proctor as to why he believed Butler suffered a behavioral abnormality that makes him likely to engage in predatory acts of sexual violence and heard extensive testimony from Mauro as to why she disagreed. The jury was charged with resolving those conflicts and any credibility determinations.

In light of the entire record, we conclude "the disputed evidence a reasonable factfinder could not have credited in favor of the verdict, along with undisputed facts contrary to the verdict," is not "so significant that the factfinder could not have found beyond a reasonable doubt that the statutory elements were met." *See id*. at 678. We overrule the third issue.

In his fourth issue, Butler argues he is entitled to a new trial because Proctor's opinion that he has a behavioral abnormality is "based on an incorrect definition of this term." He does not explain what "incorrect definition" he believed Proctor used; rather, his entire issue is one sentence followed by a string cite of cases that stand for the legal proposition that an expert must use the proper legal definition. Given Butler's failure to adequately brief the issue, we conclude it is waived. *See* TEX. R. APP. P. 38.1(i). We overrule the fourth issue.

## EVIDENTIARY ISSUES

Butler's first, fifth, and sixth issues raise evidentiary complaints. Butler contends the trial court abused its discretion by allowing Proctor to testify that (1) he made a "rule out diagnosis" on sexual sadism and (2) Thorne, the non-testifying expert, also expressed an opinion that Butler has a behavioral abnormality and made a "rule out diagnosis" of sexual sadism.

Evidentiary rulings are committed to the trial court's sound discretion. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). A trial court abuses its discretion when it acts without regard for guiding rules or principles. *Id*. Even if the trial court abused its discretion in admitting certain evidence, reversal is only appropriate if the error was harmful, i.e., it probably resulted in an improper judgment. *Id*.

An expert in an SVP Act civil commitment proceeding may disclose the underlying facts or data upon which the expert bases his or her opinion if it is a type

–21–

relied upon by experts in the field in forming opinions on the subject. *In re Commitment of Talley*, 522 S.W.3d 742, 748 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *see* TEX. RS. EVID. 703, 705(a). The reasoning for this is that having an expert explain the facts he or she considered, and how those facts influenced his or her evaluation, assists the jury in weighing the expert's opinion that the person has a behavioral abnormality, which is the ultimate issue the jury must determine. *See Commitment of Langford*, No. 01-18-01050-CV, 2019 WL 6905022, at *3 (Tex. App.—Houston [1st Dist.] Dec. 19, 2019, no pet.) (mem. op.). But the expert's disclosure of these facts and data is subject to the same relevance constraints that govern admission of other kinds of evidence. *Talley*, 522 S.W.3d at 748; *see* TEX. R. EVID. 705(d) ("If the underlying facts or data would otherwise be inadmissible, the proponent of the opinion may not disclose them to the jury if their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect."); TEX. R. EVID. 403.

## A. Proctor's Opinion on Sexual Sadism

In his first issue, Butler contends the trial court erroneously permitted Proctor to testify that he made a "rule out diagnosis" that Butler might possibly be a sexual sadist. In four sentences, Butler asserts, without any analysis, that Proctor's testimony was "speculative" and therefore irrelevant. He further asserts the evidence was "inflammatory" since the State "could not come up with some valid 'paraphilia'

diagnosis which it almost always does in these cases." Given the lack of briefing on the issue, we conclude he has waived his complaint. *See* TEX. R. APP. P. 38.1(i).

Even if preserved, however, we cannot agree Proctor's testimony was speculative and thus irrelevant. To speculate means "to take to be true on the basis of insufficient evidence." *Health Care Serv. Corp. v. E. Tex. Med. Ctr.*, 495 S.W.3d 333, 339 (Tex. App.—Tyler 2016, no pet.) (op. on reh'g). At trial, Proctor was asked whether he made any rule-out diagnoses, and Butler objected to relevance. The trial court overruled the objection, and Proctor testified that he could not rule out a diagnosis of sexual sadism. As Proctor explained, Butler's offenses involved violence and threats; in particular, the evidence showed that he used a gun against both D.C. and K.W. Proctor questioned whether Butler's use of force was about more than just gaining compliance and also actually aroused him. He did not, however, have enough information to "fully diagnose" sexual sadism but believed future professionals should consider it to rule it out. Thus, Proctor's testimony is the opposite of what Butler claims it to be: he did not opine that Butler was a sexual sadist because he required more information and would not speculate that he is. This rule-out diagnosis was part of the facts and data he used in his evaluation of Butler and thus was relevant to the issue to be decided by the jury, whether Butler was a sexually violent predator. To the extent Butler's issue suggests the testimony was more prejudicial than probative, he did not object on that basis. We conclude the

trial court did not abuse its discretion in allowing the testimony. We overrule the first issue.

## B. Evidence of Thorne's Opinion

In his fifth issue, Butler contends the trial court erred by allowing Proctor to testify that Thorne, a non-testifying expert, believed Butler has a behavioral abnormality.

Prior to any witness testimony, the trial court conducted a hearing outside the jury's presence on whether Proctor could testify about Thorne's opinions. Proctor testified that he reviewed almost 2,000 pages of record and conducted a face-to-face interview with Butler before coming to an ultimate opinion that Butler suffers from a behavioral abnormality. Those records, he said, included a report by Thorne. Proctor said he relied on Thorne's ultimate opinion when formulating his own in this case. When asked if his opinion would have been the same regardless of what Thorne determined, Proctor said he did not know because "that's kind of a bell that can't be unrung."

When the issue came up at trial, Butler objected the evidence was hearsay and more prejudicial than probative under rules 403 and 705(d). The trial court overruled the objection and gave Butler a continuing objection. Proctor then testified it is "standard practice" in these types of cases to review and rely on these psychological reports made for the prison system. Proctor said he reviewed and relied on Thorne's

report, his diagnoses of Butler, and his ultimate opinion that Butler suffers from a behavioral abnormality.

Initially, we note this Court and other courts of appeals have held that rule 705 allows an expert witness to reveal a non-testifying expert's opinion as to whether a person meets the SVP criteria. *See In re Commitment of Sawyer,* No. 05-17-00516-CV, 2018 WL 3372924, at *6 (Tex. App.—Dallas July 11, 2018, pet. denied) (mem. op.); *In re Commitment Wiley*, No. 13-20-00008-CV, 2021 WL 317653, at *7 (Tex. App.—Corpus Christi–Edinburg Jan. 28, 2021, no pet.) (mem. op.); *In re Commitment of Winkle,* 434 S.W.3d 300, 315 (Tex. App.—Beaumont 2014, pet. denied); *In re Commitment of Barnes,* No. 04-17-00188-CV, 2018 WL 3861401, at *5 (Tex. App.—San Antonio Aug. 15, 2018, no pet.) (mem. op.); *In re Commitment of Carr,* No. 09-14-00156-CV, 2015 WL 1611949, at *2 (Tex. App.—Beaumont Apr. 9, 2015, no pet.) (mem. op.); *In re Commitment of Garcia,* No. 09-12-00194-CV, 2013 WL 6558623, at *6 (Tex. App.—Beaumont Dec. 12, 2013, pet. denied) (mem. op.).

Butler argues the evidence was inadmissible as "basis" evidence for Proctor's opinion because Proctor did not actually rely on Thorne's opinion in forming his own. To the contrary, Proctor testified that he both reviewed and relied on Thorne's report and ultimate opinion in formulating in his own opinion. Consequently, we consider this assertion without merit.

–25–

Butler next argues that even if Thorne's ultimate opinion was "basis" evidence, its probative value was outweighed by its prejudicial effect under rules 403 and 705(d). He argues the State "did not have much of a need" for this evidence given its limited purpose of helping the jury evaluate Proctor's opinion yet there was a danger the jury would use the evidence for substantive evidence.

Whether Butler has a behavioral abnormality was a contested issue at trial; thus, it was important that Proctor set out the bases for his opinion so that the jury could understand how he reached his opinion. Thorne's report and ultimate opinion were part of that process. Although Butler claims there was danger of prejudice because the jury could have used the evidence for substantive purposes, the trial court specifically instructed the jury not to use the evidence in that way. Specifically, the court instructed jurors in the charge that they had received "hearsay" information in the records reviewed by the experts, but that the hearsay was "admitted only for the purpose of showing the basis of the expert's opinion and cannot be considered as evidence to prove the truth of the matter asserted." Absent record evidence to the contrary, we presume the jury followed the trial court's instructions. *Sawyer*, 2018 WL 3372924, at \*6. Butler does not assert there is anything in the court's record to show the jury ignored the court's instruction. We conclude the trial court did not abuse its discretion in determining the evidence was admissible and not unfairly prejudicial. We overrule the fifth issue.

## C. Thorne's Rule-Out Diagnosis

In his sixth issue, Butler contends the trial court erred by allowing Proctor to testify that Thorne also made a rule-out diagnosis of sexual sadism. Here, Butler simply asserts that the evidence was inadmissible as "basis" evidence for reasons set out in his fifth issue. For the same reasons set out in issue five, we overrule the sixth issue.

JURY CHARGE

In his seventh issue, Butler argues the trial court reversibly erred by refusing to charge the jury that it could return a non-unanimous verdict not to commit him. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.146(b); TEX. R. CIV. P. 292(a). At the charge conference, Butler requested the charge allow a "no" finding to the question of whether he was a sexually violent predator based on the vote of at least ten jurors.

The Texas Supreme Court recently addressed this issue and concluded that although a unanimous verdict is required to find a person is a sexually violent predator, only ten votes are necessary to reach a verdict declining to find that person is a sexually violent predator. *See In re Commitment of Jones*, 602 S.W.3d 908, 913 (Tex. 2020). Thus, the trial court erred by refusing to give Butler's requested instruction. *See id*. The error, however, is reversible only if it is harmful. *Id*. (citing TEX. R. APP. P. 44.1(a).

Butler asserts the error "probably caused rendition of an improper judgment" because "it is not reasonably certain that the verdict was not significantly influenced by the trial court's failure to submit the 10–2 charge."

In *Jones*, the court concluded the error was harmless because the jury unanimously voted for a "yes" verdict, and the court thus presumed, for purpose of a harm analysis, that the jurors voted the way they did because it was their conscientious conviction. *Id*. at 915. As the court explained, if the jurors had been unable to reach an agreement, the trial court would have declared a mistrial. *Id*. Thus, the court concluded: "Because the members of the jury unanimously came to the conclusion that Jones is an SVP, an instruction explaining that a vote of ten of the jurors was sufficient for a verdict declining to find that Jones is an SVP would not have changed the outcome of the case."

As in *Jones*, the jury unanimously found Butler is an SVP; consequently, an instruction explaining that a vote of ten jurors was sufficient for a verdict declining to find Butler is a SVP would not have changed the outcome of this case. *See In re Commitment of Jones*, 602 S.W.3d at 915; *In re Commitment of Hill*, 621 S.W.3d at 346. Consequently, we conclude the error probably did not cause the rendition of an improper judgment and was harmless. *See In re Commitment of Jones*, 602 S.W.3d at 915; *In re Commitment of Hill*, 621 S.W.3d at 346. We overrule Butler's seventh issue.

We affirm the trial court's judgment.



/Amanda L. Reichek/
AMANDA L. REICHEK
JUSTICE


191007F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN RE COMMITMENT OF
MARCUS QUIN BUTLER

No. 05-19-01007-CV

On Appeal from the 282nd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. CV-1870003-
S.
Opinion delivered by Justice
Reichek; Justices Molberg and
Nowell participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered June 21, 2021.